COMMISSIONER OF INTERNAL REVENUE
v. STEARNS.

No. 325.

Circuit Court of Appeals, Second Circuit.
May 1, 1933.

Andrew D. Sharpe and Sewall Key, both of Washington, D. C. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Stanley B. Anderson, Sp. Atty., Bureau of Internal Revenue; both of Washington, D. C., of counsel), for appellant.

L. L. Hamby, of Washington, D. C. (Duer, Strong & Whitehead, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

Hieronymus, the taxpayer's testator, was a German, resident in Germany, who died on December 23, 1918. He had held certain shares and bonds in American companies, which the Alien Property Custodian seized on January 3, 1918, by virtue of the Trading with the Enemy Act (50 USCA Appendix). He left a will, probated in Germany, by which after certain pecuniary bequests of small amount, he bequeathed the rest of his estate to his three sisters, who were Germans also. The taxpayer, Stearns, a resident of Connecticut, was appointed administrator c. t. a. of his estate by the surrogate of New York county in 1925; and towards the end of 1928, the Custodian turned over to him $140,000 in cash, and shares and bonds having a value at that time of $440,000, the greater part of which he sold during the year for about $429,000. In December, 1928, he filed his account with the surrogate covering the whole period of his administration down to November 22, 1928. After paying legacies he had on hand for distribution $492,000, of

which he proposed to divide all but $50,000 among the residuary legatees, and with which he credited them in proper proportion in the account as filed. In May, 1929, the surrogate approved the account and ordered distribution of all the property but the $50,000, which was reserved for taxes. In 1929 Stearns filed an income tax return for the estate for 1928, in which he calculated profit and loss upon the value of the property when he received it from the Custodian in 1928; this the Commissioner disallowed and assessed him for a profit based upon the value at the time of Hieronymus's death in December, 1918. He also refused to allow a deduction for attorneys' expenses during administration, which had also been claimed. Stearns appealed to the Board, insisting not only that the date chosen by him was the correct one, but besides, that he was entitled as a deduction to such sums as were credited to the residuaries in his account filed in December. The Board held that the amounts credited were proper deductions under section 162 (b) and (c) of the Revenue Act of 1928, 26 USCA § 2162 (b, c), and, as this disposed of the appeal, did not decide what was the proper "base" upon which to reckon gain or loss, or whether there might be a deduction for attorneys' fees.

▉ The first question is whether the taxpayer was entitled to deduct the amounts credited. Section 161 (a) of the Revenue Act of 1928 (26 USCA § 2161 (a), assorted the taxable income of estates into four classes. The first is income accumulated for unborn or unascertained persons or contingent remaindermen, or income held for future distribution, apparently for those having vested interests. The second is income "which is to be distributed currently," or collected by a guardian subject to the orders of a court. The third is income received "during the period of administration"; and the fourth, such as the fiduciary may distribute or accumulate in his discretion. All these are subject to the same taxes as the income of individuals, and section 162 provided on whom the tax shall be imposed. Subdivision (b) of that section allows to the fiduciary the deduction of the second class; subdivision (c), the deduction of so much of the third and fourth classes as "is properly paid or credited during such year to any legatee, heir, or beneficiary." No deduction is of course allowed of the first class. The income here in question, assuming there was a taxable profit, was not within the second class; it was not "to be distributed currently," by which we understand that the will or deed directs the distribution. That

phrase is contrasted with income received "during the period of administration," and income which may be accumulated or disbursed at pleasure, and presupposes a periodic duty of the trustee, and possibly in rare cases of an executor; its typical example is the case of a life tenant. Current distribution certainly cannot refer to final distribution to residuaries of the corpus of the estate along with any income accruing during administration. Section 162 fits in with this interpretation, and indeed confirms it. It is reasonable to allow deductions to a fiduciary of what he is under an absolute obligation to pay, whether he had done so or not, and whether he has credited the payments to the beneficiary or not; they are by hypothesis the beneficiary's by the terms of the will or deed, and he can enforce their payment. But income received "during the period of administration" is to be distributed only by way of settlement, intermediate or final, when the administration has gone far enough. Such distributions, and distributions at the discretion of the fiduciary, must be actually made, or irrevocably fixed, before they become the beneficiary's as of right. They should appear in the fiduciary's return, if they are still his; in the beneficiary's, only in case he has become presently entitled to them, or received them.

▉ This serves to determine what is meant by the word, "credited," the alternative to "paid," though we can find no authority on the point. The income must be so definitively allocated to the legatee as to be beyond recall; "credit" for practical purposes is the equivalent of "payment." Therefore, a mere entry on the books of the fiduciary will not serve unless made in such circumstances that it cannot be recalled. If the fiduciary's account be stated inter partes, that would probably be enough; it would certainly be, when a court, as for example, the surrogate in this instance, passes the account and directs payment. But the unilateral act of entering the items in the account is not conclusive. In the case at bar this was particularly emphasized. One, Winckler, had laid claim to the whole residuum; Stearns set up the claim in his account, she was cited and her claim adjudged void. Probably in fact it was without substance, for she defaulted in pressing her suit, but nobody could say with certainty that she might not, and might not succeed. Stearns could not safely distribute till she was disposed of. Nothing was therefore "credited" to the residuaries during the year 1928, and if profits had been realized there was a tax to pay. Burnett v. Whitehouse, 283

U. S. 148, 51 S. Ct. 374, 75 L. Ed. 916, 73 A. L. R. 1534, is not pertinent; all it held was that when an annuity is charged alike on corpus and income, it is a gift whatever the source of the particular payments, unlike Irwin v. Gavit, 268 U. S. 161, 45 S. Ct. 475, 69 L. Ed. 897, where the payments had to come from income alone. The distribution here was a bequest of a joint fund of principal and income; so far as it was income, it retained its character.

■ There remains the question of the proper time at which to fix the "base." Had the Alien Property Custodian not intervened, the second sentence of section 113 (a) (5), Revenue Act 1928, 26 USCA § 2113 (a) (5), would have fixed it as of December, 1918, when the testator died. But the property was already in the Custodian's possession, seized by him nearly a year before. If the seizure had been a confiscation, and the return by Congress a cession back of property of the United States, Stearns, who as administrator was "the decedent's estate," would have acquired nothing from the "decedent"; the property would have come from the United States. However, the seizure was not a confiscation. True, the power to seize rested upon the constitutional power of Congress to make "captures on land and water," clause 11, § 8, art. 1, U. S. Constitution; Stoehr v. Wallace, 255 U. S. 239, 242, 41 S. Ct. 293, 65 L. Ed. 604. But Congress was not bound to go the whole way; it might sequester without confiscating. The frame of the act did indeed leave the meaning somewhat uncertain. Apparently seizure changed "title"; it was the substitute for the voluntary act by which the property might be "conveyed, transferred, assigned, delivered, or paid over.". Section 7 (c), Trading with the Enemy Act, as amended by Act Nov. 4, 1918 (50 USCA Appendix, § 7 (c). The Custodian had the powers of "a common-law trustee," § 12, as amended by Act March 28, 1918, § 1 (50 USCA Appendix § 12), which cannot without undue strain be supposed to go without the legal title on which such powers ordinarily depend. But even though we grant so much, the beneficial interest need not pass, and section 12 itself shows that there was no purpose at the time that it should; for it was enacted that all enemy claims to "property received and held * * * shall be settled as Congress shall direct." No doubt the power to confiscate was held in reserve, but it was not exercised and might never be. In fact it never was, except in small part. That this was the general intent, the reports of the two Houses amply disclose.

House Reports, 83; Senate Reports, 113; 65th Congress, 1st Session. Such was the general understanding. "Post-War International Law," John Bassett Moore, 27 Col. L. Rev. 400, 408. The contrary would have violated international usage of at least one hundred years.

■ Thus the situation was like that in Brewster v. Gage, 280 U. S. 327, 50 S. Ct. 115, 74 L. Ed. 457, which arose under the Revenue Act of 1921, which was in substance the same as the second sentence of section 113 (a) (5) of the Revenue Act of 1928. It read that "property, acquired by bequest, devise, or inheritance" should be valued "at the time of such acquisition." 42 Stat. 229, § 202 (a) (3). The court decided that residuary legatees "acquired" their bequests at the date of the testator's death, though deprived of control and enjoyment during the period of administration. Section 113 (a) (5) does indeed change the law as to bequests; makes pecuniary bequests and all inheritances date from "distribution," and specific bequests from death. But even an executor does not properly speaking take by bequest, and an administrator of course does not. As to such "acquisition" the intent is plain, and Brewster v. Gage, supra, 280 U. S. 327, 50 S. Ct. 115, 74 L. Ed. 457, rules, though, as there, control and enjoyment are suspended.

Nor were there conditions upon the "acquisition" such as made it contingent in the sense that contingent remainders are such, which though specific are reckoned from the time when they fall in. Lane v. Corwin, 63 F.(2d) 767 (C. C. A. 2). The reserved power of Congress to confiscate the property cannot be regarded as a condition, precedent or subsequent. It equally existed pendente bello, though the property had never been seized at all; the seizure merely made it easier to exercise, if occasion should arise. It would scarcely be argued, we suppose, that the property of enemies was only conditionally "acquired" by their executors, pendente bello, if there had been no seizure, although probate and administration had been meanwhile forbidden. The seizure was no more than any other conservation to protect the property meanwhile, and make it available for any juristic purpose. Indeed the act itself, section 9 (d) and (g) Trading with the Enemy Act, 50 USCA Appendix § 9 (d, g), and note, recognized that property in the Custodian's possession should devolve upon the enemy's death, as though it had not been seized. For these reasons we conclude that Stearns "acquired" the estate upon the death of Hierony-

mus, and that the "base" was to be taken as of December, 1918.

An opposite ruling would bring about a whimsical result. Section 24 (b) of the Trading with the Enemy Act, enacted in 1928 (50 USCA Appendix § 24 (b), provided that the Custodian should pay all income and estate taxes falling due upon property in his hands. Subdivisions (c), (d) and (e), § 24 (50 US CA Appendix § 24 (c–e), gave certain relief in such cases, but they are not pertinent here. Thus, if the Custodian had sold the shares and bonds before turning them over to Stearns, he would have paid an income tax upon them, for he would have "realized" a gain. There would first have been an estate tax payable, based upon the values at the time of Hieronymus's death, and thereafter an income tax, "based" upon the values at that time of anything sold thereafter. But if the taxpayer is right, he escapes such a tax to the extent that the property increased in value between death and payment by the Custodian. Thus the accident, arising perhaps from the desire of the Custodian to protect the property, would become the means of escaping a tax which would otherwise be payable. It is extremely unlikely that this would have been tolerated, had the possibility been observed. Nothing but the strongest evidence of intent should lead us to an opposite conclusion.

The final question is of the allowance for attorneys' fees during administration. On this the Board did not pass, and the parties have given it scanty attention here. The facts have not been made to appear with enough detail to allow us to pass upon it, and as the case must go back in any event, we shall not try to deal with it on the meagre evidence before us.

Order reversed; cause remanded.