Robert E. HARRIS and Dorothy H. Harris, Appellants,

v.

UNITED STATES of America, Appellee.

No. 10541.

United States Court of Appeals Fourth Circuit.

Argued Oct. 6, 1966.

Decided Dec. 9, 1966.

---

William G. Wilson, Logan, W.Va., and W. E. Parsons, Huntington, W. Va., for appellants.

Albert J. Beveridge, III, Atty., Dept. of Justice (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson and Melva M. Graney, Attys., Dept. of Justice, and Milton J. Ferguson, U. S. Atty., on the brief), for appellee.

Before SOBELOFF, BRYAN and CRAVEN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge.

Recovery of income taxes paid for 1954, 1955 and 1956 was unsuccess-

fully sued for in the District Court by Robert E. Harris and his wife, and they appeal. The decisive point is whether moneys received by him from a family-owned corporation in these years were repayments on a loan or were dividends. On the undisputed facts we think the assessment as income—dividends—was not warranted, and we reverse.

By his will B. C. Harris, a resident of West Virginia who died on February 11, 1948, devised an estate appraised at $925,684.57 for the ultimate benefit of his wife, Lula M. Harris; his son Robert E. Harris (taxpayer); and his nephew Carl F. Shelton. Named as executors were his wife and a lawyer. Distribution of the estate was prescribed principally by the following testamentary provisions:

"FIRST: I direct my executors, hereinafter named, to pay my funeral expenses and all my just debts, including Federal Estate and State Inheritance Taxes, before any distribution of my estate as hereinafter directed is made."

\* \* \* \* \* \*

"TENTH: All the rest and residue of my estate not hereinbefore disposed of, including both real and personal property, I give, devise and bequeath to my executors, hereinafter named, TO HAVE AND TO HOLD IN TRUST for the following purposes and upon the conditions and restrictions hereinafter set forth:

(a) I direct that my said executors shall administer my estate as soon as may be reasonably and practically done, including the payment of my just debts and all Federal Estate Taxes and State Inheritance Taxes, and including also the payment of all outstanding debts and liabilities of my three businesses known as Logan Mercantile Company and Harris Funeral Home of Logan, and Rose Funeral Home of Beckley.

(b) When all such debts, taxes and other liabilities have been paid, and my estate otherwise fully administered, save and except for the current operating expenses of such business, I direct my said executors shall cause the formation of two corporations, the first of which shall be formed to continue the operation of the Logan Mercantile Company and Rose Funeral Home, and the second of which shall be formed as a holding company for the purpose of holding, managing and otherwise operating my said real estate and other interests. \* \* \*

(c) Upon the formation of said corporations, and after my said estate shall have been administered as directed, I direct my said executors to transfer the trust property to said respective corporations for further operations and that when such transfer shall have been completed, this trust shall cease and terminate and all further duties and obligations on the part of said executors shall cease and terminate. In organizing said corporations and directing the issue of stock therein, I direct that my said executors shall cause the issuance and delivery of such stock to the following named persons, and in the following proportions as indicated:

1. To my wife, Lula M. Harris, twenty (20) per cent of the stock of each of the two corporations.

2. To my son, Dr. Robert Edwin Harris, forty (40) per cent of the stock of each of the two corporations.

3. To my nephew, Dr. Carl F. Shelton, forty (40) per cent of the stock of each of the two corporations."

\* \* \* \* \* \*

"ELEVENTH: In the event that at the time of my death, there are insufficient liquid assets to pay all my just debts, including Federal Estate Tax, State Inheritance and other taxes, then I direct my said executors to sell so much of my real estate as may be necessary to pay said indebtedness, or borrow money for such pur-

poses and empower and authorize my said executors to encumber any and all of my real estate, and to sell any and all of my real estate for the purpose of obtaining sufficient money to pay my just debts. * * *"

* * * * * *

"FIFTEENTH: During the continuance of the trust herein created under paragraph Ten of this, my Last Will and Testament, I *direct* my executors to pay out of the net income of my estate, to Lula M. Harris, Dr. Robert Edwin Harris and Dr. Carl F. Shelton, such part thereof as in their opinion they deem advisable, and that *their judgment and discretion in this respect shall be unrestricted,* except that such sums as may be paid out of the net income of my said estate shall be made and paid to said three named beneficiaries in the following proportions:

(a) Lula M. Harris, twenty (20) per cent.

(b) Dr. Robert Edwin Harris, forty (40) per cent.

(c) Dr. Carl F. Shelton, forty (40) per cent." (Accent added.)

The net income of the estate for the first three years was this:

| | |
|---|---|
| 1948 | $149,031.47 |
| 1949 | 55,121.01 |
| 1950 | 3,562.10 |
| Total: | $207,714.58 |

This income as received was credited on the books of the executors to the beneficiaries in separate accounts. From time to time cash payments thereof were made to them and charged to their accounts. The income so credited, however, largely remained in the accounts of the beneficiaries.

The moneys so remaining, together with other sums advanced by the beneficiaries, were with their consent used by the executors to defray Federal estate and State inheritance taxes. This application of the estate income was dictated by the desire to save the liquidation for that purpose of the decedent's real estate, which then appeared to be on a rising market. A sale, the executors thought, would sacrifice its fair value.

The credits of the estate income to the taxpayer during 1948, 1949 and 1950 came to $83,085.83. Along with that posted to the other beneficiaries, this credit was reported each year by the executors to the Internal Revenue as a payment made to the taxpayer. Each beneficiary returned and paid taxes on these credits as income in the respective years.

Meanwhile, the executors organized Harris, Incorporated, as the holding company ordered by the will, opening for business on July 1, 1949. At that time the principal assets assignable to Harris, Inc. were transferred to it. The remainder due Harris, Inc. was received by the corporation on July 1, 1950, the aggregate assets amounting to $331,584.-84. This over-all figure was entered on the corporate books as capital stock (250 shares at $100 par value) of $25,000 and "Paid-in or Capital Surplus $306,584.84." On July 1, 1950 the following entry was made:

"Surplus—Paid-In ...............................$244,512.01
 Mrs. Lula M. Harris ...................$146,334.85
 R. E. Harris ......................... 54,640.99
 Carl F. Shelton ...................... 43,536.17
  This entry made to repay advancements on Federal Estate and West Virginia Inheritance Taxes on the Estate of B. C. Harris.
  Notes Payable ...............................$244,512.01"

The figures opposite the beneficiaries' names represent amounts owing to them from the estate, as reckoned by the executors before they closed the adminis-

tration on October 2, 1950. Included was the total of the remaining balances due the beneficiaries out of the net estate income credited to the beneficiaries. The excess of $36,797.43 of the aggregate of the notes—$244,512.01—over the total —$207,714.58—of the estate net income for 1948, 1949 and 1950 is made up of other advancements made by the beneficiaries to the estate. For these balances the corporation's 6% demand notes were given the beneficiaries.

Taxpayer's note was for $54,640.09. Payments were made to him in 1954, 1955 and 1956. They were designated as interest and curtails. The interest was returned by him for taxation as income. The remainder was treated by the taxpayer as repayment of loans made to the estate. This treatment was disallowed by the Commissioner of Internal Revenue. He determined there was no loan of the estate-income-moneys and that the whole of such payments to the taxpayer was dividends. On this determination he assessed deficiencies which were paid by the taxpayer and are the subject of his suit.

■ The position of the Government is that the net income, although posted to the account of the beneficiaries, remained as part of the estate, was appropriately used by the executors and was turned over to the corporation as a portion of the estate assets. The assertion is that the taxpayer never had such control over the funds as would enable him to make a loan of the sums put to his account. This stance is taken because of the will's directions that the executors pay costs of administration, debts and taxes before distributing the estate. The argument is that if the income was needed to pay taxes, as taxpayer and the other beneficiaries say was the purpose of their loans to the estate, then there could have been no valid pre-disbursement of these moneys to them. Hence, before the taxes were paid, the moneys

credited to the beneficiaries were not beyond the control of the executors.

To fortify this view the Government refers to sections 162(b) and (c), Internal Revenue Code of 1939 [1], with its judicial interpretations, stating what distributions of income during administration are deductible in computing taxes on estate income. The statute reads:

"(b) [as amended by Sec. 111(b), Revenue Act of 1942, c. 619, 56 Stat. 798] There shall be allowed as an additional deduction in computing the net income of the estate or trust the amount of the income of the estate or trust for its taxable year which is to be distributed currently by the fiduciary to the legatees, heirs, or beneficiaries, but the amount so allowed as a deduction shall be included in computing the net income of the legatees, heirs, or beneficiaries whether distributed to them or not. As used in this subsection, *'income which is to be distributed currently' includes income for the taxable year of the estate or trust, which, within the taxable year, becomes payable to the legatee, heir, or beneficiary.* Any amount allowed as a deduction under this paragraph shall not be allowed as a deduction under subsection (c) of this section in the same or any succeeding taxable year;

"(c) In the case of income received by estates of deceased persons *during the period of administration or settlement of the estate,* and in the case of income *which, in the discretion of the fiduciary, may be either distributed to the beneficiary or accumulated,* there shall be allowed as an additional deduction in computing the net income of the estate or trust the amount of the income of the estate or trust for its taxable year, which is *properly* paid or *credited* during such year to any legatee, heir, or beneficiary, but the amount so allowed as a deduction shall be included in computing the net in-

1. The Government agrees that it is immaterial whether the applicable statute is the 1939 or the 1954 Internal Revenue Code, for they are not substantially unlike in the provisions relevant now.

come of the legatee, heir, or beneficiary." (Accent added.)

In Commissioner of Internal Revenue v. Stearns, 65 F.2d 371, 373 (2 Cir. 1933), cert. den. Stearns v. Burnet, 290 U.S. 670, 54 S.Ct. 90, 78 L.Ed. 579 "distributed currently" was construed in a statute corresponding to § 162(b) to mean a distribution *required* by the will, and thus money to which the beneficiary is absolutely entitled, whether or not paid. Likewise, the meaning in 162(c) of "properly credited" was said to contemplate that the distributions "must be actually made, or irrevocably fixed, before they become the beneficiary's as of right. * * * The income must be so definitively allocated to the legatee as to be beyond recall; 'credit' for practical purposes is the equivalent of 'payment'. Therefore, a mere entry on the books of the fiduciary will not serve unless made in such circumstances that it cannot be recalled." Accord, Lynchburg Trust & Savings Bank v. Commissioner, 68 F.2d 356, 359 (4 Cir. 1934), cert. den. Helvering v. Lynchburg Trust & Savings Bank, 292 U.S. 640, 54 S.Ct. 773, 78 L.Ed. 1492.

In answer taxpayer adverts to the *direction* and the authorization of the executors under item Fifteenth of the will "to pay out of the net income of my estate [to the three beneficiaries] * * * such part thereof as in their opinion they deem advisable, and that their judgment and discretion in this respect shall be unrestricted * * *." The executors had the absolute right, avows the taxpayer, to transfer irrevocably the net income to the beneficiaries in the percentages fixed in the will. The executors, he avers, did so in 1948, 1949 and 1950 in providing the moneys which were later loaned by the beneficiaries to the estate.

We sustain that view of the taxpayer. There is no necessary conflict in the will between the *first direction* for payment of the taxes, and the *subsequent direction* to "pay out" the income during "the continuance of the trust", i. e. until the estate corpus was turned over to the corporation. Under clause Eleventh of the will the sale or encumbrance of the real estate, or an outside borrowing, was made a primary and ready source for the payment of taxes. Indeed, as we note in a moment, the corpus of the estate apparently was made the first resource. Thus in the mind of the testator the income disbursements to the beneficiaries during administration were not incompatible with the obligation also to make early satisfaction of the taxes. Seemingly, the motivation for distribution of the income was the testator's awareness that the settlement of the estate would occupy considerable time because of his instructions for the continuance of his three businesses.

Neither Commissioner of Internal Revenue v. Stearns, supra, 65 F.2d 371, nor Lynchburg Trust & Savings Bank v. Commissioner, supra, 68 F.2d 356, nor Estate of Hubbard, 41 B.T.A. 628 (1940), the case on which the District Court placed its decision here in favor of the Government, requires that result. All of them held that in their circumstances the income received during administration had not been "properly paid or credited" to the legatees. In none of them, however, did the will affirmatively direct the payment of such income to the beneficiaries. Indeed, in *Hubbard* the Board of Tax Appeals emphasized, "The will of the decedent did not provide for a distribution of income separate from a distribution of principal". (p. 632)

Per contra, the Harris will manifests the testator's intent that his wife, nephew and son (the taxpayer) have accessibility to the income without awaiting the closing of the estate. The discretion of the executors was not exercisable in the entitlement of the beneficiaries to the income, but only in the amount.

Alma Igoe, 19 T.C. 913 (1953) is closer precedent here. There the beneficiaries were credited with the income for one year. Nevertheless they failed to report it for taxation. The Tax Court rightly held the distributees answerable for the taxes. Obviously, there the Government pressed an argument just to the contrary of its contention now.

The Government endeavors to differentiate *Igoe* on the ground that the estate in that instance was able to pay the taxes without looking to the income. No such distinction is sound, however. Here the estate could not call on the net income to satisfy these obligations, of course, because it had been distributed in accordance with the directions of the will. But, to repeat, evidently anticipating this possibility the testator pointed to a ready source of payment, authorizing the executors to dispose of such real estate as might be necessary, or to borrow the money, for this purpose.

Furthermore, it is noteworthy that the Eleventh clause of the will, supra, directed the executors to determine the sufficiency of the liquid assets to pay the estate taxes *at the time of the testator's death.* In the event such liquidity was lacking they were directed to *borrow, or to sell real estate,* with authorization to encumber it as necessary. This again suggests that the executors were to look only to the liquidity of the corpus, not to the subsequent income for the payment of taxes.

■■ When the will clearly indicates, as appears in the portions to which we have adverted, that the estate income is not to be first charged with the payment of taxes, it is the law of West Virginia that the mandate of the will be followed.[2] Cuppett v. Neilly, 143 W.Va. 845, 105 S.E.2d 548, 563 (1958). The Federal law, I.R.C.1939, § 822(b), directing only that the tax be paid, leaves its impact and apportionment to the administering State. Riggs v. del Drago, 317 U.S. 95, 63 S.Ct. 109, 87 L.Ed. 106 (1942). The Tax Court of the United States has so acknowledged. Alma Igoe, supra, 19 T.C. 913, 924.

■ As the money to honor the credits was available to the executors, there is no warrant for holding that they "were a sham, or were part of some device or sub rosa understanding that no distributions of income could be based upon crediting of income to the legatees". Id. 924. Moreover, there is no showing of a sham here, but rather an effectuation of the testamentary directions.

A testamentary injunction upon executors to satisfy costs of administration, debts and taxes before distributing the estate does not, as was quite correctly conceded by the Government in argument, nullify a distribution made before satisfaction of these items. The only result is to make the personal representatives and their surety liable therefor, if the remaining estate proves insufficient to meet these items. Consequently, there can be no doubt that the credits gave the present beneficiaries good title to the moneys segregated by the entries and then in the hands of the executors. Evidently, the Government considered the sequestrations valid and effective when made in 1948, 1949 and 1950. Without objection the United States acknowledged the credits as income to the beneficiaries. No attempt was ever made to assess this income to the estate, notwithstanding a greater tax would have thereby been realized and the Government was informed by the executors of this distribution of the estate income.

In short, we find there was a recognizable—and recognized—allocation of estate income among the distributees and a sustainable loan by them to the estate.

Once a debt, this sum remained a debt. It is important and imperative to observe the continued survival of the obligation, for the Government's defense now is that payments to the taxpayer in 1954, 1955 and 1956 constitute dividends. The claim is based on section 316, Internal Revenue Code of 1954, defining a divi-

---

2. We note that should a fiduciary pay West Virginia taxes due on property under his control, W.Va. Code § 11A–1–11, apparently unconstrued, expresses indifference as to whether he be refunded from the property or its income.

    Since the passage of W.Va. Code § 44–2–16a in 1959, the mandate to follow the will has been made statutory.

dend.[3] We hold the contention without merit.

The reasoning of the Government is that the testamentary directions for the payment, first, of all debts and taxes evince the testator's intention that his net estate be assigned to the corporation unencumbered. Consequently, the Government continues, the assets cannot be considered as coming into the hands of the corporation subject to debts owing the beneficiaries, and the claim of the beneficiaries is not maintainable in face of the will. To begin with, this is but a repetition of the earlier argument of the Government. It presupposes that the beneficiaries were never in absolute control of the moneys credited to them, and that these funds remained with the estate and passed to the corporation free of any pre-incorporation right of the beneficiaries, an argument we have already rejected. Secondly, the Government's argument overlooks the testator's authorization of the executors to encumber the real estate, one of the assets to be conveyed to the corporation.

In this connection, it is worthy of mention that the assumption by the corporation of the liability of the estate to the beneficiaries is expressly stated in the memorandum appended to the final account submitted by the executors to the State court and signed by the corporation. It specifically bound the corporation "to pay the indebtedness incurred by said executrix and said executor, the said indebtedness having been incurred for the purpose of preventing the sale of the assets of B. C. Harris estate". Without this agreement, the debts to the beneficiaries would necessarily have been settled before the estate was closed and the corporation entitled to the assets. Their concurrence negates the idea that the beneficiaries were contributing this money as capital. This memorandum was executed in October 1950, and so was not suggested by the assessment the Government made in this case for 1954, 1955 and 1956. Moreover, it is worthy of note that the executrix in her deposition testified that the debts were transferred to the corporation because to settle them would have necessitated the sale of real estate.

■ In conclusion, it is inconceivable that moneys to which the beneficiaries were entitled and could have withdrawn, can be metamorphosed into dividends through the incorporation. Further, for the Government to win here would be to impose an income tax twice upon Robert E. Harris for the same receipts. The record and reasoning in this case do not justify either of these results. And since the decision of the District Court was based entirely upon factual stipulation and documentary evidence, in not following its conclusions we are not offending the "clearly erroneous" precept of Rule 52(a) F.R.Civ.Proc. Hicks v.

---

3. "SEC. 316. DIVIDEND DEFINED.

   (a) *General Rule.*—For purposes of this subtitle, the term 'dividend' means any distribution of property made by a corporation to its shareholders—

   (1) out of its earnings and profits accumulated after February 28, 1913, or

   (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

   Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection."

   Here the relevant statute is taken from the 1954 Code, because the payments to the taxpayer were made at the time when the 1954 Code was effective. The Code of 1939, as heretofore noted, was the basis of the Government's argument in regard to the validity of the credits of income in 1948, 1949 and 1950. As observed in fn. 1, *supra*, the applicable provisions in the two codes are not so dissimilar as to make an issue in this case.

United States, 368 F.2d 626 (4 Cir. decided October 27, 1966).

We will reverse the judgment of the District Court disallowing the claims of the taxpayer, and remand the case for the entry of a judgment in his favor for the tax overpayments for which he has sued.

Reversed and remanded.