ESTATE OF KEITH WOLD JOHNSON, DECEASED, SEYMOUR M. KLEIN, BETTY W. JOHNSON, AND ROBERT J. MORTIMER, EXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 18799-85.          Filed January 29, 1987.

*Milton Gould* and *Allan Parker*, for the petitioner.
*Lawrence Blaskopf* and *John Becker*, for the respondent.

WILLIAMS, *Judge*: The Commissioner determined deficiencies in petitioner's Federal income tax for the taxable years 1980 and 1981 as follows:

| Year | Deficiency |
|---|---|
| 1980 | $269,963 |
| 1981 | 109,165 |

Petitioner claims an overpayment in Federal income tax in the amounts of $712,045 for 1980 and $93,198 for 1981. The issues for decision are (1) whether petitioner correctly reported capital gains realized from its collection on certain notes in 1980 and 1981; and (2) whether petitioner properly deducted as income distributions in 1980 and 1981 amounts credited to the Estate of Willard T.C. Johnson.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioner is the Estate of Keith Wold Johnson (sometimes hereinafter referred to as decedent's estate). Petitioner's address was New York, New York, at the time its petition was filed. Petitioner timely filed fiduciary income tax returns for the taxable years 1980 and 1981.

Decedent, Keith Wold Johnson, was majority shareholder of American Video Corp. (AVC) at the time of his death. Toward the end of 1974, AVC required additional funding and sought a loan from the Union Commerce Bank of Cleveland (the bank). The bank agreed to loan the money to AVC only if decedent personally guaranteed the loan and assigned a life insurance policy on his life to the bank as collateral.

To induce decedent to enter into a guarantee agreement with the bank, AVC entered into an indemnity agreement with decedent on December 6, 1974. Decedent subsequently entered into a guarantee agreement with the bank. In accordance with the terms of the guarantee agreement, decedent purchased two adjustable term life insurance policies on his life from the Occidental Life Insurance Co. of California (Occidental) in the total amount of $7 million. Decedent designated the bank as beneficiary on the policies "as their interest may appear, balance, if any to the Estate of the insured." Both policies were issued on February 1, 1975, and assigned to the bank as collateral security for the

loans to AVC. If decedent were to die before the AVC notes were repaid, the guarantee agreement provided that the bank would receive the proceeds from the insurance policies and assign its interest in the AVC notes to decedent's estate to the extent the proceeds satisfied the notes.

Decedent died on March 28, 1975, of acute cocaine poisoning. Because of the circumstances of his death, Occidental claimed that it had a complete defense to payment on the insurance policies and a dispute arose between Occidental on one side and the bank and petitioner on the other. On January 29, 1976, the bank and petitioner entered into an agreement under which the bank would release petitioner from liability on the loan to AVC and the parties would work together to collect the insurance proceeds. On June 14, 1976, Occidental and the bank settled their dispute. Pursuant to their agreement, Occidental paid the bank a net amount of $4,200,000. The bank then assigned to petitioner an interest in the AVC notes to the extent of $4,200,000.

Petitioner filed an estate tax return on or about June 17, 1976. On the return, petitioner attributed no value to the life insurance policies on decedent's life. In a statement attached to the return petitioner explained:

Since the $4,200,000 of net insurance proceeds ultimately receivable was pledged as security for the AVC indebtedness to Union Commerce and was paid to the latter, the only right of the decedent or his estate at the date of death was a possible right to a subordinated participation in Union Commerce's loans to AVC.

The value as of the date of decedent's death of a $4,200,000 subordinated participation in Union Commerce's loans to AVC under the terms of the Guarantee Agreement of December 6, 1974 has been appraised by Lehman Brothers, New York City, as having negligible value.

On October 10, 1978, respondent sent petitioner a Report of Estate Tax Audit Changes. The report proposed an increase in the value of petitioner's possible right to subordinated participation in the bank's loans to AVC from $0 to $2,100,000. On June 25, 1979, the parties entered into a closing agreement pursuant to section 7121.[1] The agree-

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

ment established a value for estate tax purposes and an unadjusted basis for income tax purposes of $600,000 for petitioner's right to subordinated participation in the bank's loans to AVC.

AVC became financially solvent after substantial capital investment by a subsequent owner. In 1980 and 1981, AVC paid the balance of its debt to the bank and to petitioner. Petitioner received $3,699,526 from AVC in 1980 and $421,329 in 1981. On its fiduciary income tax return for 1980, petitioner reported a basis of $520,755 for its interest in the AVC notes. This amount represented the $600,000 unadjusted basis set in the closing agreement, less $79,245 received from AVC in 1979. Petitioner claimed a $0 basis in the notes on its fiduciary income tax return for 1981. Petitioner reported capital gains in the amount of $3,178,771 for 1980 and $421,329 for 1981.

Petitioner subsequently concluded that it was entitled to increase its basis in the AVC notes by the $4,200,000 that Occidental paid on the insurance policies. Petitioner filed amended returns claiming refunds of capital gains taxes paid in 1980 and 1981 on the repayment of the AVC notes. In his notice of deficiency dated March 21, 1985, respondent rejected petitioner's refund claims.

There are five residuary beneficiaries of decedent's estate: Willard T.C. Johnson (Willard), Elizabeth R. Johnson, Robert W. Johnson IV, Christopher Johnson, and Sheila Johnson Brutsch. Willard survived decedent but died soon after him, and Willard's estate was entitled to his distributive share of decedent's estate. The estates of decedent and Willard have the same executors and accountants.

The sole beneficiaries of Willard's estate are charitable organizations. In his will, Willard bequeathed $100,000 to the Lawrenceville School in Lawrenceville, N.J. The residue of his estate was to be transferred to a charitable foundation, the Willard T.C. Johnson Foundation, Inc. (the foundation), to be established by the executors of the estate. The estate transferred $100,000 to the Lawrenceville School on December 2, 1976, and organized the foundation prior to 1980. The executors of Willard's estate were also the directors of the foundation.

The accounting firm of Main Hurdman or its predecessor has at all times served as accountant for both estates. Richard Stone, C.P.A., has been the partner charged with reviewing the estates' tax compliance. In this capacity he worked with Miles Rosenberg, C.P.A., a senior partner in Main Hurdman, and Samuel Klein, an executor of the two estates. Rosenberg is now deceased.

In the early part of 1976, Klein met with Rosenberg to discuss tax matters relating to petitioner, and particularly how to make annual distributions of income from petitioner to Willard's estate. On Rosenberg's advice, Klein instructed the accountants to transfer funds by making book entries on the records of each estate each year crediting a 20 percent share of petitioner's income to Willard's estate. The entries were characterized as deemed distributions from petitioner to Willard's estate. In the course of preparing fiduciary income tax returns for petitioner and for Willard's estate for each year, accountants at Main Hurdman prepared workpapers annually for each estate showing transfers of income from decedent's estate to Willard's estate. The workpapers are the only documentary evidence of income allocation from petitioner to Willard's estate.

Petitioner elected to credit Willard's account through entries on the workpapers rather than actually transferring funds because of the significant contingent liabilities and other contingencies that prevented it from settling the estate. Klein testified that the executors would not make any cash distributions until they had collected all of petitioner's assets and settled its liabilities. There had been no cash transferred between the estates as of the end of 1981 and Willard's estate had not transferred any funds to the foundation. As of the close of 1981 petitioner had not made distributions of income to any of its other beneficiaries.

For each of the years 1976 through 1981 petitioner deducted as a distribution the amount of book entry credited to Willard's estate. Willard's estate included the distributions in gross income but because all of its income was irrevocably vested in a charitable foundation, it had no income tax liability.

The workpaper showing petitioner's transfer of income to Willard's estate for 1981 was prepared in March 1982. The practice of the accounting firm was to prepare tax workpapers after the close of the taxable year.

There is no date on the workpaper for 1980 and no indication of who prepared it, but Stone testified that workpapers were prepared by his staff members in the ordinary course of business. The workpaper for petitioner for 1980 was prepared on a copy of the workpaper for 1979. The year 1979 and the name of the preparer were crossed out, and the year 1980 and new information were inserted. The entries on the workpaper were made in pencil and, in some places, numbers had been erased. Stone did not know who had made the erasures or what had been erased but stated that entries on work papers were always made in pencil. The workpaper was found in petitioner's file with other 1980 work papers.

At the time of his death, decedent had amassed significant contingent assets and liabilities. Numerous disputes arose concerning decedent's liabilities and, as a result, petitioner had not been able to make principal distributions to any of its beneficiaries by the end of 1981. The many outstanding contingent liabilities and other contingencies made it reasonable for decedent's estate to be kept open through 1981.

The executors also kept Willard's estate open through 1981. There were no unsettled claims to which Willard's estate was subject in 1980 or 1981, and 100 percent of the income and corpus of the estate was irrevocably vested in the foundation. The executors, however, had yet to collect the interest of Willard's estate in petitioner, which was a substantial asset of perhaps $2 million. The executors determined that they could not close Willard's estate and make a final accounting until decedent's estate had settled all of the disputes concerning its liabilities and was prepared to distribute its assets.

In his notice of deficiency dated March 21, 1985, respondent disallowed petitioner's income-distributions deductions for 1980 and 1981.

OPINION

The first issue we must decide is whether petitioner correctly reported its capital gain on the disposition of the AVC notes in 1980 and 1981. After recovering the $600,000 unadjusted basis in the notes set by the 1979 closing agreement, petitioner reported as capital gain for each year, the amounts paid by AVC. Subsequently, petitioner concluded that it had been entitled to adjust basis by the $4,200,000 of insurance proceeds that Occidental paid to the bank and, that as a result, it realized no gain when AVC repaid its $4,200,000 indebtedness.[2] Respondent rejected petitioner's claims for refunds for 1980 and 1981 as a breach of the closing agreement. A closing agreement, once approved by the Secretary, is a final and conclusive agreement between the parties as to all matters contained therein. The agreement may not be annulled, modified, set aside, or disregarded, except "upon a showing of fraud, malfeasance or misrepresentation of a material fact." Sec. 7121(b)(2); see *Cramp Shipbuilding Co. v. Commissioner*, 14 T.C. 33, 37 (1950), affd. per curiam sub nom. *Commissioner v. Harriman Ripley & Co.*, 202 F.2d 280 (3d Cir. 1953). Petitioner contends that it is not attempting to disregard or set aside the closing agreement, but seeks only to adjust its basis in the notes to reflect events that occurred subsequent to decedent's death, the date for which the agreement set the basis.

The basis of an asset set by a closing agreement is subject to adjustment by subsequent events. Basis is set as of a particular date, and events occurring after that date, as for example depreciation of, or improvements to, property can necessitate adjustments to that basis. The closing agreement, in this case, set petitioner's unadjusted basis in its right to subordinated participation in the AVC notes, as of the date of decedent's death, at $600,000. After decedent's death but before the parties entered into the closing agreement, Occidental paid $4,200,000 on its insurance policies on decedent's life to the bank, and the bank

_____

[2] Petitioner recognizes that if its position is correct, Occidental's payment on the insurance policies increased its basis to $4,800,000 ($4,200,000 plus $600,000), resulting in a capital loss when AVC repaid the notes. Petitioner chose not to claim a capital loss on its amended returns for 1980 and 1981.

transferred $4,200,000 worth of AVC notes to petitioner pursuant to the guarantee agreement. Petitioner contends that it constructively received the insurance proceeds and transferred them to the bank in exchange for the AVC notes.[3]

Respondent concedes that the basis of an asset set in a closing agreement may be adjusted to reflect subsequent events, but contends that petitioner cannot adjust its basis in the notes in this case because to do so would contradict the position that petitioner took, and respondent accepted, in entering into the closing agreement. We agree. Petitioner reported on its estate tax return and represented in the closing agreement that it had no right to the life insurance proceeds because it had assigned that right to the bank as collateral security for the bank's loans to AVC, and had retained only a subordinated participation right in the notes.[4] In agreeing to enter into a closing agreement setting the value (and consequent income tax basis) of petitioner's subordinated participation right in the notes at $600,000, respondent relied on petitioner's representation. Petitioner now attempts to change that representation and contends that it should be deemed to have received the insurance proceeds under the doctrine of subrogation and the terms of the guarantee agreement and to have transferred the proceeds to the bank in exchange for the AVC notes.

Petitioner does not suggest that there was any fraud, malfeasance, or misrepresentation of a material fact by respondent that would allow this Court to disregard the closing agreement. See sec. 7121(b). Moreover, petitioner's current argument is not based on any facts that petitioner could not have known or anticipated at the time it entered into the closing agreement. Indeed the insurance proceeds had already been paid to the bank. In setting petitioner's

---

[3]If these were the facts, petitioner would acquire a cost basis in the notes equal to the $4,200,000 that the bank was paid for them. Petitioner would not realize any gain on the payment of those notes by AVC. Moreover, the insurance proceeds would be excluded from income. Sec. 101(a).

[4]Petitioner states on its estate tax return the following:

"Since the $4,200,000 of net insurance proceeds ultimately receivable was pledged as security for the AVC indebtedness to Union Commerce and was paid to the latter, the only right of the decedent or his estate at the date of death was a possible right to a subordinated participation in Union Commerce's loans to AVC."

basis in its right to payment on the notes, the parties knew about the very transaction that petitioner now seeks to characterize as a subsequent event that requires an adjustment to basis. Payment of the insurance proceeds was the heart of the controversy settled by the closing agreement. The bank had been paid; petitioner held the AVC notes and was no longer liable to the bank; and the only remaining issue was the value of petitioner's prospect of recovering on the notes. Thus, regardless of whether petitioner's current position is correct,[5] it contradicts the position petitioner agreed to in entering into the closing agreement and, having entered into that agreement, petitioner is bound by it. See *Cramp Shipbuilding Co. v. Commissioner*, 14 T.C. at 37. Petitioner, therefore, correctly reported its capital gain on the repayment of the AVC notes on its 1980 and 1981 income tax returns.

The next issue for decision is whether petitioner was entitled to deductions pursuant to section 661(a)(2) for income it claims to have distributed to the Estate of Willard T.C. Johnson in 1980 and 1981. The resolution of this issue depends on our resolution of three sub-issues: (1) Whether the administration of the Estate of Willard T.C. Johnson was unduly prolonged; (2) whether the crediting and debiting of income on the accounting workpapers relating to the 1980 and 1981 fiduciary income tax returns of each estate constituted distributions; and (3) if the credits and debits were distributions, whether they were made in the years for which petitioner claimed distribution deductions.

Whether the administration of an estate has been unduly prolonged is a question of fact. *Stewart v. Commissioner*, 196 F.2d 397, 398 (5th Cir. 1952); *Estate of Farrier v. Commissioner*, 15 T.C. 277, 282 (1950). If the administration of an estate is unduly prolonged beyond a reasonable time for the performance of all administrative duties, the estate will be deemed to be closed for Federal tax purposes. Sec. 1.641(b)-3(a), Income Tax Regs.; *Stewart v. Commissioner, supra.* Where an executor is also named trustee of a trust

---

[5]Because of our agreement with respondent on this issue, we do not express any view on the merits of whether Occidental's payment to the bank is a constructive receipt of insurance proceeds by petitioner.

created under a will, the period of administration continues until the executor completes his administrative duties and assumes his duties as trustee. Sec. 1.641(b)-3(a), Income Tax Regs. The administration of an estate will not be considered to be unduly prolonged if, upon diligent effort, the executor has not completed the ordinary duties of administration such as the collection of assets and the payment of debts, taxes, legacies, and bequests.[6]

Respondent contends that the administration of Willard's estate was unduly prolonged and that the estate should be deemed terminated as of the beginning of 1980. Termination would have the effect of treating any amount credited to Willard's estate in 1980 and 1981 as if it had been credited to the foundation, the sole remaining residuary beneficiary under Willard's will. Consequently, petitioner could not deduct any amount credited to the foundation because such an amount would not be distributed to a beneficiary, sec. 1.661(a)-2, Income Tax Regs., and because decedent's will did not specifically provide for any distribution to a charity. Sec. 642(c); sec. 1.663(a)-2, Income Tax Regs.; *United States Trust Co. v. Internal Revenue Service*, 803 F.2d 1363 (5th Cir. 1986); *Estate of O'Connor v. Commissioner*, 69 T.C. 165 (1977). Petitioner argues that because Willard's estate was entitled to receive a 20 percent share in decedent's estate, the executors could not close Willard's estate until decedent's estate was prepared to distribute its assets. The parties have stipulated that decedent's estate was not prepared to distribute its assets in 1980 or 1981.

The burden of proving entitlement to a deduction generally rests on petitioner. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. If respondent introduces a new issue, however, he bears the burden of proof as to that issue. *Achiro v. Commissioner*, 77 T.C. 881, 890 (1981). Respondent first argued that Willard's estate had been unduly prolonged at trial, prejudicing petitioner's opportunity to prepare for trial. As to this issue, therefore, respondent bears the burden of proof. He has not met that burden.

By the end of 1981, due to no fault of theirs, the executors of Willard's estate had not yet performed one of

---

[6]See *Maresca Trust v. Commissioner*, T.C. Memo. 1983-501.

their principal functions as executors, the collection of all of the assets of the estate. See sec. 1.641(b)-3(a), Income Tax Regs.; cf. *Old Virginia Brick Co. v. Commissioner*, 44 T.C. 724, 730 (1965). In addition, the executors, who also served as directors of the foundation, had not assumed their duties as directors by the end of 1981. See sec. 1.641(b)-3(a), Income Tax Regs. (administration of estate continues until executors who are also trustees actually assume duties as trustees). The administration of Willard's estate was, therefore, not unduly prolonged as of the close of 1981.

Next we must determine whether the crediting of income on the accountant's workpapers and the reporting of income on the fiduciary income tax returns of petitioner and of Willard's estate in 1980 and 1981 can be considered to be distributions within the meaning of section 661. Section 661(a) provides:

SEC. 661(a). DEDUCTION.—In any taxable year there shall be allowed as a deduction in computing the taxable income of any estate or trust (other than a trust to which subpart B applies), the sum of—

(1) any amount of income for such taxable year required to be distributed currently * * * and

(2) any other amounts properly paid or credited or required to be distributed for such taxable year;

but such deduction shall not exceed the distributable net income of the estate or trust.

The Second Circuit has interpreted the requirement that amounts be "properly credited" as follows:

The income must be so definitively allocated to the legatee as to be beyond recall; "credit" for practical purposes is the equivalent of "payment." Therefore, a mere entry on the books of the fiduciary will not serve unless made in such circumstances that it cannot be recalled. If the fiduciary's account be stated inter partes, that would probably be enough * * * But the unilateral act of entering items in the account is not conclusive. * * * [*Commissioner v. Stearns*, 65 F.2d 371, 373 (2d Cir. 1933), cert. denied sub nom. *Stearns v. Burnet*, 290 U.S. 670 (1933). Emphasis added.][7]

*Harris v. United States*, 370 F.2d 887, 892 (4th Cir. 1966); see *Igoe v. Commissioner*, 19 T.C. 913, 923-924 (1953).

---

[7]In *Commissioner v. Stearns*, the Second Circuit interpreted section 162(c) of the Revenue Act of 1928, which provided a deduction for an estate for amounts "properly paid or credited during such year to any legatee, heir, or beneficiary." 65 F.2d at 373. The Internal Revenue Code of 1954 did not materially change the relevant language.

Petitioner and Willard's estate have the same executors and accountants. In 1976 Klein, one of the executors, met with Rosenberg, a senior partner of Main Hurdman, and instructed him to make the appropriate entries each year to credit 20 percent of petitioner's income to Willard's estate. Since 1976, under the direction of Richard Stone, who was the accountant charged with reviewing tax compliance for both estates, staff members of Main Hurdman have prepared annual workpapers for both estates showing the distributions. The workpapers were prepared in the ordinary course of business. The entries on the workpapers do not reflect any actual exchange of money, but Willard's estate treated the amounts credited as income on its 1980 and 1981 income tax returns pursuant to section 662(a), and petitioner claimed distributions deductions for the same amounts on its 1980 and 1981 returns. See sec. 661(a)(2).

Petitioner contends that because of the identity of executors and accountants, neither formal bookkeeping entries nor actual separation of funds was necessary to credit income from petitioner to Willard's estate within the meaning of section 661(a)(2). In petitioner's view, the informal workpapers, prepared in the ordinary course of business, were sufficient to evidence a commitment to set aside funds beyond the recall of petitioner, its creditors, and its other beneficiaries. Petitioner also argues that the consistent reporting of the transfers on the income tax returns for both estates is further evidence of its intent to permanently set aside the funds for Willard's estate. Respondent contends that the workpapers did not place the amounts transferred beyond petitioner's recall and that the amounts were, therefore, not properly credited within the meaning of section 661(a)(2).

We agree with respondent. The workpapers, which were informal documents prepared in pencil, are the only records showing the transfers of funds between the estates. Stone testified that workpapers were prepared in the ordinary course of business after the close of each taxable year, always in pencil, and kept in the files for each estate. We nonetheless cannot find that the workpapers were sufficiently permanent documents to function as the books of the estate. We are convinced that, were petitioner to make a

bad investment or incur unexpected indebtedness on its large contingent liabilities, the funds credited on the workpapers to Willard's estate would not be insulated from the claims of petitioner's creditors or other beneficiaries.

Petitioner chose to credit Willard's account through entries on the workpapers rather than actually transferring cash specifically because of the numerous contingent liabilities and other contingencies preventing it from settling the estate. Although the consistent income tax reporting of the transfers by both estates is evidence that the amounts were intended to be permanently set aside for Willard's estate (cf. *In re Estate of O'Neil*, 68 Misc. 2d 634, 327 N.Y.S.2d 725, 732 (Surr. Ct. 1972), it is not enough to meet petitioner's burden of proof. Willard's estate, as a residuary beneficiary, can receive only the residue of petitioner's assets. Thus, it was prudent for the executors not to make cash distributions until they had collected all of petitioner's assets and settled its liabilities. As one of the executors testified, "we did not make any distributions to any of the beneficiaries * * * we felt it would be prejudicial to them to divide the thing in five places, we felt it was our duty to stay there and settle all claims, negotiate the claims, pay our taxes, collect all the assets and dispose of the liabilities."[8]

We do not hold that, where the representatives or accountants for estate and beneficiary are the same, funds must be physically segregated to satisfy the "properly credited" standard of section 661(a)(2). Entries on the books of the estate may be sufficient in such cases, but we do not believe that workpapers such as those prepared in this case can achieve an allocation beyond the recall of the executors, and petitioner has not shown us that New York law is otherwise. The amounts credited to Willard's estate in 1980 and 1981 were not, for Federal income tax purposes, distributions within the meaning of section 661, and petitioner is not entitled to deductions for them.

Because we hold that petitioner is not entitled to deductions for the amounts credited to Willard's estate in 1980 and 1981, we need not decide whether the amounts were

[8]Transcript of trial, June 27, 1986 at 169.

actually credited in the years for which petitioner claimed deductions.

To reflect the foregoing,

*Decision will be entered for the respondent.*