Filed 11/10/20  Papais v. Papais CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| JOHN DUANE PAPAIS, | C088688 |
| Plaintiff and Appellant, | (Super. Ct. No. STKPRTR20180000117) |
| v. | |
| DANIEL PAPAIS, | |
| Defendant and Respondent. | |

John Papais, husband, and Elizabeth E. Papais, also known as Betty, wife, established the Papais Trust in 1991.  Under the terms of the Papais Trust, formed as an "A/B trust," upon the death of one of the settlors, the surviving spouse was to allocate trust assets to either the revocable "Survivor's Trust" or the irrevocable "Family Trust."  Plaintiff John Duane Papais and defendant Daniel Papais, the settlors' sons, were to be

1

the equal beneficiaries following the death of the surviving settlor spouse.[1] John died in 1993. Following Betty's death in 2017, plaintiff discovered that the real property that is the subject of this action, which he believed to be a trust asset to be divided equally between the parties following Betty's death, had been conveyed in 2004 from Betty as trustee to Betty individually and then immediately from Betty to defendant. Defendant had sold the property and retained the proceeds. Plaintiff filed a petition pursuant to Probate Code sections 850 and 17200, seeking a judgment declaring the real property and proceeds from the sale thereof was owned by the irrevocable Family Trust, and therefore he was entitled to half of the proceeds from the sale of the property. Plaintiff also sought an accounting.

The trial court denied the petition. On appeal, plaintiff asserts that Betty did not transfer the subject real property from the Papais Trust to the revocable Survivor's Trust. He further asserts that Betty did not effectively convey the property from the trust to herself individually, and then to defendant, in 2004. According to plaintiff, the real property remained part of the trust at the time of Betty's death, and therefore the proceeds from the sale of the real property should be divided equally between plaintiff and defendant. Plaintiff also raises his purported entitlement to an accounting.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Papais Trust

John and Betty were married and had two children, plaintiff and defendant. John and Betty created the Papais Trust on January 29, 1991. John and Betty were to be the original trustees and the initial primary beneficiaries. The settlors transferred assets to the trust for no consideration. During the settlors' joint lifetime, the trust was to be

---

[1] Because the parties and their parents all share the same last name, to avoid confusion we refer to John Papais as John and Elizabeth Papais as Betty.

2

revocable and they could alter or amend it.  The settlors' powers to amend or revoke the trust were personal to them and not exercisable on their behalf by any conservator or anyone else.  The trust provided that, "So long as either of us is acting as Trustee, we can exercise any power over the trust property as though this trust had never been created . . . ."

The trust provided that upon the death of one of the settlors, "the Trustee shall divide the trust estate, including all property received as a result of the decedent's death, into two shares, each share to be administered as [a] separate trust to be known respectively as the 'Family Trust' and the 'Survivor's Trust.' "  The Family Trust was to be funded with the decedent spouse's separate property and his or her interest in the community property "to the extent of a pecuniary amount equal to the maximum sum that can be allocated to a trust that does not qualify for the federal estate tax marital deduction to any extent, which will result in the least federal estate tax being imposed on the decedent's estate," taking certain specified matters into account.  As for the Survivor's Trust:  "All of the rest and residue of the assets of the trust estate shall be allocated to the Survivor's Trust."  The surviving spouse "may amend, revoke or terminate the Survivor's Trust, but the Family Trust may not be amended or revoked."

Upon the death of the surviving spouse, the Survivor's Trust and the Family Trust would both terminate.  The trustee was directed to distribute the trust estate "in accordance with and to the extent provided by the Survivor's exercise of his or her power of appointment."  Otherwise, upon the surviving spouse's death, the trustee "shall distribute the trust estate to our children, in equal shares, free of trust."

The trust listed the parties as successor co-trustees.  The trust further provided that appointees named together were to serve jointly as co-trustees.

Schedule A, Section O, of the trust, entitled "<u>Use of Home</u>," stated, in part, "Unless otherwise provided in this instrument, the Trustee shall allow the Survivor to occupy and use until his or her death, the home (or any interest therein) used by either or

3

both Trustors as a principal residence at the time of the Decedent's death. The Trustee shall, at the discretion of the Survivor, sell such home and, if the Survivor so directs, purchase and/or build another comparable residence to be used as a home for the Survivor, and so on from time to time. The Survivor shall not be required to pay any rent for the use of such home. [¶] Subject to the foregoing occupancies, any such home (or interest therein) held by the trustee, or the proceeds from the sale thereof, shall be part of the principal of these Trusts. All taxes, insurance, repairs, and assessments concerning such home shall, in the discretion of the Trustee, be paid out of the trust estate containing such home."

### Grant Deeds, Life Estate Grant Deed, and the Settlors' Deaths

In a grant deed recorded on August 30, 1991, John and Betty granted the subject real property to themselves as trustees of the Papais Trust. John died on June 2, 1993.

A grant deed dated January 20, 2004, was recorded in San Joaquin County on January 30, 2004. In it, Betty, as trustee, granted the subject real property to herself as an unmarried woman as her sole and separate property.

A life estate grant deed dated January 20, 2004, was recorded in San Joaquin County on January 30, 2004. In it, Betty granted the subject real property to defendant as his "sole and separate property." Betty reserved "to herself exclusive permission for the use and enjoyment of the rents, issue and profits of the above-granted premises for and during the natural life of the Grantor."

Betty died on February 2, 2017.

### The Dispute Arises

Written correspondence between the parties and individuals representing them demonstrates that, in 2017, plaintiff contested the handling of the subject real property. Plaintiff asserted that the subject real property "was still recorded as a part of the Papais Family Trust at the time [Betty] signed and recorded the Life Trust, therefore making the

4

recorded deed invalid. As a part of the family trust, the interest could only be split 50/50 in accordance with the trust and not given to one of the executors."

Defendant's position was that Betty effectively gave the subject real property to him in 2004, subject to a life estate in favor of Betty. "Simply stated [plaintiff] ha[d] no right to any of the proceeds from the sale of the Property. It was [defendant's] decision to sell the Property following the death of [Betty] on terms that he found acceptable."

Plaintiff's attorney countered that "the . . . property was still recorded and was part of the Papais Family Trust at the time that [Betty] signed and recorded a Grant Deed transferring the property from the Papais Family Trust to her as her sole and separate property. That was done in 2004. Of course . . . John died in 1993. [Betty] left the . . . property in the Papais Family Trust from 1993 until 2004. That entire time you and your brother would have split the proceeds from the sale of the . . . property when your mother died and it was sold. [¶] It is [plaintiff's] belief that as part of the Papais Family Trust, the interest in the property could only be split 50/50 in accordance with the terms of the Papais Family Trust and not given to one of the Executors of the Trust. [Plaintiff] believes that as a co-executor of the Papais Family Trust, [defendant] had a fiduciary responsibility to [plaintiff] to share any distribution of the assets in that Trust." Plaintiff, through his attorney, accused defendant of persuading or coercing Betty into signing the deeds in 2004, leveraging Betty into making changes "that she was not necessarily in favor of."

Responding to the letter from plaintiff's attorney, defendant's attorney stated that Betty "freely and without any undue influence deeded to [defendant] the property . . . and retained for herself a life estate in the Property. The Property was taken out of the Papais Family Trust by Betty . . . prior to the deed to" defendant.

**The Petition**

Plaintiff filed a petition pursuant to Probate Code sections 850 and 17200 seeking a judgment declaring his interest in the subject real property and/or the net proceeds from

5

the sale of that property belonging to the trust. According to plaintiff, upon the death of the surviving spouse, the irrevocable Family Trust was to be distributed equally to plaintiff and defendant. The petition asserted, "If [Betty] created the Survivor's Trust, she would also have the right to distribute any assets held in the name of that trust to any person she wanted to, however, she must do this by *a written power of appointment document*; otherwise the net proceeds of the Survivor's Trust would have been required to be distributed to her two son's [*sic*] equally, or in the same manner that the Family Trust was to be distributed . . . ."

Plaintiff alleged that, upon John's death, Betty "did not fulfill her legal obligation as trustee of the original trust to create the Family Trust nor did she create a Survivor's Trust, nor did she ever create a written power of appointment document to distribute '*her share*' of the trust to anyone she desired as required per the terms of the original trust." (Capitalization omitted.) Plaintiff urged the trial court to "find that all assets that were in the trust at the time of John's death, should have been funded into the irrevocable Family Trust, including the real property . . . at issue and distributed equally to their two sons, the [Plaintiff] and Defendant . . . ." (Capitalization omitted.)

Plaintiff further asserted that the subject real property was a community asset of the settlors originally funded into the Papais Trust in 1991 by grant deed. John died in 1993. According to the petition, on September 23, 2003, Betty removed John's name from the original trust deed by filing an affidavit, making her the sole surviving trustee. The petition continued: "about 11 years after John passed, Betty transferred the home out of (what should have been) the irrevocable trust and granted it to herself . . . as her sole and separate property on January 20, 2004. On the same day, she transferred the home to the Defendant via a Grant Deed, reserving a '*life estate*' for herself. By doing this, Betty in effect violated the terms of the trust agreement which said that all community property should remain and be managed by the (now irrevocable trust, because John died) trust, because she did not create a Survivor's Trust and fund it with her 50% of the community

property, and she did not use the power of appointment language to transfer this property to another as required per the terms of the original trust." (Capitalization omitted.) Plaintiff stated that defendant had sold the real property and refused to split the net proceeds with plaintiff.

Plaintiff believed that, other than the subject real property, all other trust property had been distributed equally to the parties as required under the trust. However, plaintiff stated that only a complete and formal accounting could confirm this.

Plaintiff alleged that defendant breached a number of duties he owed plaintiff as a beneficiary of the trust. These duties included the duty to administer the trust; the duty of loyalty; the duty to deal impartially with beneficiaries; the duty to avoid conflicts of interest; the duty to take control of and preserve trust property; the duty to make trust property productive; and the duty to keep trust property separate and identified.

Plaintiff sought a judgment declaring that the real property, and therefore the proceeds from the sale of the real property, was owned by the irrevocable Family Trust, and therefore plaintiff was entitled to fifty percent of the net proceeds from the sale. Plaintiff further sought a complete and formal accounting "from the time that Betty became incompetent to manage her affairs up, until the time [defendant] makes a final distribution to the [plaintiff] per the terms of the trust." (Capitalization omitted.)

**Defendant's Opposition to the Petition**

According to defendant, on January 20, 1994, Betty, plaintiff, defendant, and Betty's accountant met to discuss the allocation of assets to the two sub-trusts. A memo, prepared by plaintiff, addressed the allocation of assets to the Family Trust and the Survivor's Trust. Pursuant to that memo, the subject real property was to be allocated to the Survivor's Trust.

According to defendant, over the next several years, Betty assisted plaintiff in a number of financial matters. She did not similarly assist defendant. "By 2004, Betty was aware that if the Survivor's Trust were divided equally between [plaintiff] and

7

[defendant], then [plaintiff] would end up receiving more financial benefit from the Trust than [defendant] since [defendant] had not received the financial assistance that Betty had provided to" plaintiff. She therefore elected to transfer title in the subject real property from the trust to herself, and then deeded the real property to defendant, retaining a life estate for her own benefit. Betty lived at the subject real property until she moved to a skilled nursing facility and subsequently died. Upon Betty's death, the life estate was extinguished and defendant was free to do with the real property as he wished. Defendant sold the real property and retained all proceeds from the sale.

Defendant included the January 20, 1994, memo prepared by plaintiff as exhibit A to his opposition.[2] Insofar as relevant here, the memo addressed the separation of assets into the two separate sub-trusts. According to the memo, the real property that is the subject of this action was to be assigned to the Survivor's Trust. The memo also noted, regarding assets in the Survivor's Trust: "The value of the assets [in the Survivor's Trust] will be assessed at your death and any value over the $600,000. will be taxed with the trust paying +/- 40% to Uncle Sam. In order to avoid this taxation, [Betty's accountant] suggested that you think about transferring some of the survivor trust assets to the estates of your heirs prior to your demise." (Capitalization omitted.)

**Plaintiff's Reply**

In reply, plaintiff asserted that the memo was insufficient to show that Betty allocated the subject real property to the Survivor's Trust. Plaintiff also asserted that Betty could not transfer the subject real property from the trust to herself and then from herself to defendant in 2004 without first revaluing all of the assets in the trust to present day value. Plaintiff asserted that there may be no way to determine if Betty fulfilled her

---

[2] The typewritten date of the memo is January 20, 1993. However, the year is amended in handwriting to read 1994. It is undisputed that the memo was drafted in 1994.

8

duties as surviving trustee, if she misappropriated or misused principal of the Family Trust, or if she materially breached her duties as trustee owed to her children.

Plaintiff summarized: "The issue for this court to decide is whether Betty could transfer the family home outright, in its entirety, to the [defendant] before she passed. The transfer could be wholly proper if [the] court determined that the house could be held solely in the Survivor's Trust; conversely, if the house was should have been [*sic*] held in whole or in part by the Family Trust, then the transfer could not have been a valid transfer, as upon John's death in 1993, Betty lost the power to revoke the Family Trust in whole or in part as it became *irrevocable* at the time of his passing (if it were ever properly and formally funded as required by the terms of the trust in the first place, which we do not know at this time). This analysis is further complicated being that there are no facts to indicate whether Betty in fact ever *formally funded and allocated* the dual Family Trust and Survivor's Trust back to the time that her spouse passed in 1993."

Plaintiff asserted that the court should rule that the subject real property was to be held in a constructive trust for the benefit of, and to be divided equally among, plaintiff and defendant.

### The Trial Court's Order and Judgment

The trial court denied the petition and entered judgment in favor of defendant and against plaintiff.[3] In an order and judgment, the trial court denied the petition and awarded defendant costs.

---

[3] Plaintiff asserts in his opening brief that the trial court "ruled from the bench." Because there is no court reporter's transcript and this is a judgment roll appeal, the record does not disclose whether the court articulated its reasoning when it issued its ruling.

# DISCUSSION

## I.  This is a Judgment Roll Appeal

The parties stipulated to designate the original superior court file as the record on appeal.  (See generally Cal. Rules of Court, rule 8.128; Ct. App., Third Dist., Local Rules, rule 2, Stipulation for use of original superior court file.)  As plaintiff acknowledges, in the absence of a reporter's transcript or other record of the trial court's proceedings, the appeal is treated as an appeal on the judgment roll.  (*Allen v. Toten* (1985) 172 Cal.App.3d 1079, 1082-1083.)  Accordingly, "we ' "must conclusively presume that the evidence is ample to sustain the [trial court's] findings," ' " and our "review is limited to determining whether any error 'appears on the face of the record.' " (*Nielsen v. Gibson* (2009) 178 Cal.App.4th 318, 324-325 (*Nielson*); accord, *Kucker v. Kucker* (2011) 192 Cal.App.4th 90, 93.)  "In a judgment roll appeal based on a clerk's transcript, every presumption is in favor of the validity of the judgment and all facts consistent with its validity will be presumed to have existed.  The sufficiency of the evidence is not open to review.  The trial court's findings of fact and conclusions of law are presumed to be supported by substantial evidence and are binding on the appellate court, unless reversible error appears on the record."  (*Bond v. Pulsar Video Prods.* (1996) 50 Cal.App.4th 918, 924 (*Bond*).)

## II.  Standard of Review and Interpretation of Trust Language

"[T]he de novo standard of review . . . applies . . . to the interpretation of written instruments, including a trust instrument, unless the interpretation depends on the competence or credibility of extrinsic evidence or a conflict in that evidence."  (*Pena v. Dey* (2019) 39 Cal.App.5th 546, 551, citing *Wells Fargo Bank v. Marshall* (1993) 20 Cal.App.4th 447, 452-453.)  "Generally, the interpretation of a trust or other testamentary instrument is a question of law which we independently determine."  (*Cook v. Cook* (2009) 177 Cal.App.4th 1436, 1441 (*Cook*).)

"The paramount rule in the interpretation of a testamentary instrument is that it must be construed according to the intention of the testator as expressed therein." (*Cook, supra*, 177 Cal.App.4th at p. 1441, citing Prob. Code, § 21102, subd. (a) & *Estate of Kaila* (2001) 94 Cal.App.4th 1122, 1131.) "In order to first ascertain, and then, if possible, give effect to the intent of the trustor, the court must consider the whole of the trust instrument, not just separate parts of it. [Citation.] If the language of the instrument clearly sets forth the intent, the court does not consider extrinsic evidence; it only looks to extrinsic evidence in the event of an ambiguity. [Citations.] The trial court can consider extrinsic evidence to reveal a latent ambiguity. [Citations.] The court can also consider extrinsic evidence regarding the circumstances under which the trust was made, in order to interpret the trust instrument, but not to give it a meaning to which it is not reasonably susceptible. [Citations.] However, if the court can ascertain the testator's intent from the words actually used in the instrument, the inquiry ends. [Citation.] ' "Where the terms of [the instrument] are free from ambiguity, the language used must be interpreted according to its ordinary meaning and legal import and the intention of the testator ascertained thereby." ' " (*Trolan v. Trolan* (2019) 31 Cal.App.5th 939, 949.)

### III. The January 20, 1994, Memo

### A. Plaintiff's Contentions

Plaintiff asserts that no evidence before the trial court demonstrated that Betty "ever completed any of the formal tasks of funding the trusts and providing the required accounting during the six . . . month period required for her to complete these tasks per the terms of the Trust, nor did she complete these tasks during her lifetime . . . ." According to plaintiff, while Betty informally discussed funding the trusts in 1994 and 1998, she never "provided the [plaintiff] with any *formal documentation* showing that she followed up and formally funded the two . . . trusts as directed by the trust [*sic*] of the original trust." Plaintiff maintains that the January 20, 1994, memo he created after the meeting between plaintiff, defendant, Betty, and Betty's accountant, was only a draft

11

memo, and Betty still had to take steps to formally fund the trusts. He maintains that "the rough draft allocation document . . . *was not an entry into any books*, just a general discussion subject to change and subject to Betty taking steps to actually formally allocate and fund the two . . . trusts."

## B. Analysis

When John died in 1993, Betty became the surviving spouse under the trust. As the surviving spouse trustee, Betty was to "divide the trust estate, including all property received as a result of the decedent's death, into two shares, each share to be administered as a separate trust to be known respectively as the 'Family Trust' and the 'Survivor's Trust.' " Under the terms of the trust, "the survivor may amend, revoke or terminate the Survivor's Trust, but the Family Trust may not be amended or revoked." Thus, if, following John's death, the subject real property was allocated to the Survivor's Trust, rather than the Family Trust, Betty thereafter could do with it as she pleased.

Item number four on the January 20, 1994 memo addressed the separation of the trust assets into the Family Trust and the Survivor's Trust. The subject real property was to be allocated to the Survivor's Trust. The memo also noted: "it was made clear that the whole estate is under [Betty's] control"; "there are some requirements which have to be met if you are to liquidate any of the assets of the survivors trust which could have tax consequences"; in order to avoid tax consequences, Betty's accountant "suggested that [Betty] think about transferring some of the survivor trust assets to the estates of your heirs prior to your demise"; and "the survivor trust assets should be retitled out of the Papais Family Trust." (Capitalization omitted.)

According to defendant, "the trial court found that the [subject real property] was an asset of the Survivor's Trust, which Betty could freely amend, revoke or terminate." In support of his position, defendant cites to the trial court's order and judgment. That order and judgment, after reciting appearances, states only that, "After consideration of the evidence offered by way of stipulation by the respective legal counsel, the arguments

12

of counsel, the court's file in this matter and for good cause, IT IS THEREFORE ORDERED as follows:  [¶]  1.  The Petition is denied.  [¶]  2.  The Respondent is awarded costs of suit pursuant to a Memorandum of Costs to be filed by Respondent."

The order and judgment does not expressly state that the trial court found the subject real property was an asset of the Survivor's Trust which Betty was free to amend, revoke, or terminate.  However, if the real property was an asset of the irrevocable Family Trust, Betty could not convey it.  Moreover, the January 20, 1994, memo supports the conclusion that, following John's death, Betty effectively allocated the subject real property to the Survivor's Trust rather than failing to do so and leaving it unallocated to either of the sub-trusts.  The trial court necessarily must have made these determinations to reach its conclusion.  In a judgment roll appeal, such as this, "we ' "must conclusively presume that the evidence is ample to sustain the [trial court's] findings," ' " and our "review is limited to determining whether any error 'appears on the face of the record.' " (*Nielsen, supra*, 178 Cal.App.4th at pp. 324-325.)  We must make every presumption in favor of the validity of the judgment, and we are required to presume the existence of all facts consistent with its validity.  (*Bond, supra*, 50 Cal.App.4th at p. 924.)

Based on the evidence summarized *ante*, including the January 20, 1994, memo prepared by plaintiff, we conclude the trial court found that Betty effectively allocated the subject real property to the Survivor's Trust.  With the subject real property in the Survivor's Trust, which was fully revocable and amendable during her lifetime, Betty was free to convey the property.  In 2004, she did just that.  By grant deed, Betty first conveyed the property, as trustee, to herself as an unmarried woman.  She then granted the subject real property to defendant as his "sole and separate property," retaining a life estate for her own benefit.  Thus, as of 2004, defendant owned the subject real property free of trust, subject to a life estate in Betty.  Nothing in the record contradicts this conclusion.

13

Plaintiff relies on the language of *Commissioner of Internal Revenue v. Stearns* (2d Cir. 1933) 65 F.2d 371 (*Stearns*) as supporting his contention that Betty did not formally allocate the subject real property to the Survivor's Trust in 1994. The language plaintiff relies on states: "The income must be so definitively allocated to the legatee as to be beyond recall; 'credit' for practical purposes is the equivalent of 'payment.' Therefore, a mere entry on the books of the fiduciary will not serve unless made in such circumstances that it cannot be recalled. If the fiduciary's account be stated inter partes, that would probably be enough . . . . But the unilateral act of entering the items in the account is not conclusive." (*Id.* at p. 373.) However, even assuming the applicability of this language from *Stearns*, in the context of this judgment roll appeal, we do not find reversible error on the face of the record. (See generally *Bond, supra*, 50 Cal.App.4th at p. 924.) The record supports the conclusion that Betty allocated the subject real property to the Survivor's Trust. We conclusively presume that the evidence is ample to sustain the trial court's findings. (*Nielsen, supra*, 178 Cal.App.4th at pp. 324-325.)

On this record, we conclude that Betty allocated the subject real property to the revocable and amendable Survivor's Trust in 1994, and, in 2004, she properly conveyed the property from the Survivor's Trust to herself individually, and then to defendant. The property belonged to defendant as his sole and separate property as of January 20, 2004, subject only to a life estate in Betty. When Betty died, this property was not part of the trust, and plaintiff was not entitled to any part of it. On this judgment roll appeal, reversible error does not appear on the record. (See generally *Bond, supra*, 50 Cal.App.4th at p. 924.)

### IV. Transfer of the Subject Real Property Out of the Survivor's Trust

Article VIII of the trust provides: "So long as either of us is acting as Trustee, we can exercise any power over the trust property as though this trust had never been created . . . ." Plaintiff acknowledges this broad language in the trust that authorizes the settlors to deal with the trust property during their lifetimes. However, he asserts that

more specific language in the trust limited or contradicted that power. (See generally Civ. Code, § 3534 ["Particular expressions qualify those which are general"]; Code Civ. Proc., § 1859 [in the construction of an instrument, when a general and particular provision are inconsistent, the latter is paramount to the former, so a particular intent will control a general one that is inconsistent with it].) Specifically, he relies on language in Schedule A, Section O of the trust.

Schedule A, Section O of the trust discusses the real property at issue and states in pertinent part that following the death of the first spouse to die, "the Trustee shall allow the Survivor to occupy and use until his or her death, the home (or any interest therein) used by either or both Trustors as a principal residence at the time of the Decedent's death. The Trustee shall, at the discretion of the Survivor, sell such home and, if the Survivor so directs, purchase and/or build another comparable residence to be used as a home for the Survivor . . . . [¶] *Subject to the foregoing occupancies, any such home (or interest therein) held by the trustee, or the proceeds from the sale thereof, shall be part of the principal of these Trusts*." (Italics added.)

According to plaintiff, this trust language "indicates that the surviving spouse could occupy and use the home until his or her death and that the home or the net proceeds from the sale thereof, *shall remain as part of the principal of these Trusts . . .* after the death of the second spouse." In other words, according to plaintiff, this "is a clear indication that the trustors . . . *intended* to allow the surviving spouse to continue to use the family home until their passing and after the passing of both parents/trustors and that their two . . . children *share in the distribution of the family home or the net proceeds thereof* upon the death of the second parent."

Defendant maintains that, while the language of Section O of Schedule A granted Betty authority to live in the residence until her death, it did not require her to hold the residence as an asset of the trust for her lifetime. Rather, according to defendant, this "language was likely included in Schedule A of the Trust to protect the Survivor so that

15

he or she could continue to occupy the Residence without fear that the Trustee (should it be someone other than the Survivor)[4] could sell or otherwise dispose of the Residence without the Survivor's consent." According to defendant, Section O of Schedule A cannot be interpreted as requiring Betty to retain the subject real property in trust until her death or to mean that the subject real property was required to be allocated to the Family Trust.

We agree with defendant that the language of Section O of Schedule A does not limit the settlors' ability to do with the subject real property as they wished, unless it was transferred to the irrevocable Family Trust upon the death of the first spouse to die. The third paragraph of Section O provides: "Subject to the foregoing occupancies, any such home (or interest therein) *held by the trustee*, or the proceeds from the sale thereof, *shall be part of the principal of these Trusts*." (Italics added.) But we do not read this provision as requiring the subject real property to be divided among the Survivor's Trust and the Family Trust, requiring that any portion of the subject real property must be allocated to the Family Trust, or otherwise requiring that the subject real property remain part of the principal of both trusts, or a particular trust, until the death of the surviving spouse. Rather, we interpret this language only to provide that, so long as the subject real property is "held by the trustee," it shall be part of the principal of one or both trusts. Thus, when the subject real property was not allocated to the irrevocable Family Trust, but instead was held in the Survivor's Trust, once Betty conveyed the property from herself as trustee to herself as an individual, the property was no longer "held by the

---

**4** The trust contemplated the surviving spouse not serving as trustee as a result of, among other things, incapacity or resignation. If neither of the settlors served as trustee, the parties were to serve as successor co-trustees. However, the trust also contemplated the resignation of one or both successor co-trustees and the appointment of a trustee not named in the trust. Thus, it would be possible for the named successor co-trustees, or even an unnamed successor trustee, to serve as trustee during the lifetime of the surviving spouse.

16

trustee" as contemplated by this language on which plaintiff relies.  Moreover, neither this language nor any other language in the trust expressly provided that the subject real property was to be held, in whole or in part, in the Family Trust following the death of the decedent spouse.

Additionally, as defendant points out, the sentence immediately following the language on which plaintiff relies indicates:  "All taxes, insurance, repairs, and assessments concerning such home shall, in the discretion of the Trustee, be paid *out of the trust estate containing such home*."  (Italics added.)  As defendant asserts, this language contemplates that the subject real property could be allocated to either one or the other of the sub-trusts, and it was not required that it be allocated to both or to the Family Trust.

Plaintiff also relies on language in Article VII of the trust, which addresses distribution after both settlors died.  The provisions upon which he relies state:  "On the death of the Survivor, if and to the extent that the Survivor shall not have effectively disposed of all property of the trust estate of the Survivor's Trust through a valid and effective exercise of a power of appointment, all of the remaining assets of the trust shall be distributed to the then-acting Trustee of the Family Trust, to be added to and form part of the assets of the Family Trust and to be held, administered, and distributed as set forth below."  Relying on this language, coupled with the language of Schedule A, Section O, directing that the home was to be in "these trusts," plaintiff asserts that there is no evidence in the record demonstrating that Betty executed a valid power of appointment,[5]

_____

[5]  In his brief, plaintiff actually states that there is no evidence that Betty executed a valid "power of attorney."  Given the context of plaintiff's argument and the fact that he does not otherwise refer to power of attorney in his briefing, we understand his argument to be there was no evidence that she executed a valid power of appointment.

17

and therefore the subject real property should have become part of the irrevocable Family Trust upon her death.

However, based on the evidence in the record, we presume, in favor of the validity of the judgment, that the trial court validly found Betty conveyed the subject real property out of the revocable Survivor's Trust prior to her death. The provisions of Article VII of the trust pertain to distribution of trust assets following the death of both settlors, and thus have no applicability to real property properly transferred out of the revocable Survivor's Trust by the surviving spouse during her lifetime.

Plaintiff asserts that he was never told of the transfer of the real property to defendant notwithstanding the fact that he "became a vested beneficiary *of the irrevocable Family Trust* when [John] passed and therefore he was entitled to notice *regarding any assets that should have been included in the Family Trust*." (Italics added.) We have concluded that the subject real property was not part of the Family Trust, but rather was allocated to the Survivor's Trust as evidenced by the January 20, 1994, memo. Thus, even assuming plaintiff's assertion that he became a vested beneficiary of the irrevocable Family Trust upon John's death to be true, this is ultimately irrelevant here. The subject real property was not allocated to the Family Trust, and plaintiff has not established any other basis for his purported entitlement to notice regarding this asset.

Plaintiff repeatedly raises Betty's alleged duty to obtain up-to-date appraisals of the trust property as of 2004 when she attempted to fund the two trusts and transferred the home to herself, to ensure the trust property was allocated properly. Among other things, he relies on *Penny v. Wilson* (2004) 123 Cal.App.4th 596 (*Penny*), in which the court concluded that "by allocating [certain real property] to the survivor's trust without taking into account the appreciation in value of 16 years, [the surviving spouse] disregarded the purpose of the trust to distribute the trust estate in equal shares among the children. Therefore his allocation of [that property] to the survivor's trust is not a binding and

18

conclusive act."[6]  (*Id*. at p. 607.)  However, we have concluded that Betty allocated the

subject real property to the Survivor's Trust on January 20, 1994, as evidenced by the

memorandum of that date, months after John's death.  *Penny* is inapposite and plaintiff's

contentions are without merit.[7]

---

[6]  The *Penny* court also determined that the surviving spouse breached his trust duties by transferring the most valuable trust asset to another sub-trust, which was to benefit only her children.  (*Penny, supra*, 123 Cal.App.4th at p. 607.)  This holding is not applicable here where the property at issue was transferred out of the revocable Survivor's Trust during the surviving spouse's lifetime and where, other than the subject real property, plaintiff has not alleged receiving an unequal share of the trust property.

[7]  Plaintiff repeats on numerous occasions, often in connection with his arguments concerning the failure to revalue the trust assets, that the trust required the Survivor's Trust and the Family Trust to be of equal value.

As stated *ante*, the Family Trust was to be funded with the decedent spouse's separate property and his or her interest in the community property "to the extent of a pecuniary amount equal to the maximum sum that can be allocated to a trust that does not qualify for the federal estate tax marital deduction to any extent, which will result in the least federal estate tax being imposed on the decedent's estate," taking certain specified matters into account.  As for the Survivor's Trust:  "All of the rest and residue of the assets of the trust estate shall be allocated to the Survivor's Trust."  The trust then discusses in connection with the Survivor's Trust further compliance with the marital deduction.

Plaintiff does not identify any provision of the trust that requires the two sub-trusts to be of equal value.  The trust does state that, upon the death of the decedent spouse, the trustee shall divide the trust estate "into two shares," one for the Survivor's Trust and one for the Family Trust.  However, it does not state that the trust was to be divided "into two *equal* shares."  Black's Law Dictionary defines "share" as, among other things, "An allotted portion owned by, contributed by, or due to someone; a single portion distributed among several."  (Black's Law Dict. (11th ed. 2019).)  It defines "share" as meaning "equal shares" only in the context of "[o]ne of the definite number of equal parts into which the capital stock of a corporation or joint-stock company is divided," a meaning not at issue here.  Long ago, this court stated, in the context of an oral agreement:  "To share does not demand necessarily an equal division."  (*Hellings v. Wright* (1916) 29 Cal.App. 649, 653.)  In the absence of a trust provision specifying that the shares allocated to the Survivor's Trust and the Family Trust were to be equal, plaintiff's

Plaintiff also repeatedly raises the contention that Betty failed to satisfy formal requirements of the trusts. Among these requirements, Section X of Schedule A provided that, whenever a trustee makes a distribution or division of trust assets into separate trusts on a trustor's death, the trustee may, in his or her discretion, defer that distribution or division until six months after the trustor's death. Assuming the subject real property was allocated to the Survivor's Trust on January 20, 1994, that was more than seven months after John's death. However, the trust does not indicate that this discrepancy would result in the nullification of the allocation. Plaintiff does not argue that it did, as his position is that the subject real property was not allocated to the Survivor's Trust on January 20, 1994. Reversible error does not appear on the face of the record establishing that the trial court should have determined that the tardiness of the allocation following John's death rendered that allocation a nullity. (*Nielsen, supra*, 178 Cal.App.4th at pp. 324-325; *Bond, supra*, 50 Cal.App.4th at p. 924.) As to any other formal trust requirements, we presume in support of the validity of the judgment on this judgment roll appeal that Betty satisfied any necessary requirements. Plaintiff's contention that Betty failed to follow other trust requirements is not established on this record. (*Nielsen,* at pp. 324-325 [we conclusively presume the evidence is ample to sustain the trial court's findings and our review is limited to determining whether reversible error appears on the record].) Moreover, for the most part, the formal tasks plaintiff raises do not apply, as the

position that the shares allocated to each sub-trust were to be equal is not supported by the trust language. Indeed, the language directing the allocation to each of the sub-trusts, allocating the decedent spouse's separate property and an amount of his or her interest in the community property with a specified cap to the Family Trust, with all of the rest of the assets going to the Survivor's Trust, suggests a likelihood that the two sub-trusts would not be funded equally.

In any event, plaintiff's misconception is ultimately not relevant to our determinations. Particularly, as discussed *ante*, we reject plaintiff's argument that trust assets should have been revalued because we have concluded that the subject real property was allocated to the Survivor's Trust in January 1994.

20

subject real property was allocated to the Survivor's Trust in 1994 and conveyed to defendant in 2004.

## V. Accounting

In his opening brief, in connection with arguing that the subject property and other trust property should have been revalued in 2004, he asserts that the "only way to find out how much the value of each asset increased or decreased in value in 2004, is to require the [defendant] to have each asset appraised at the time the home was transferred to Betty out of the family trust in 2004, as eleven . . . years had passed since the [death] of [John] in 1993 and since the time the draft memo regarding the potential funding of the two . . . trusts was discussed by Betty, her CPA and the two children." He further asserts that the only way to know the value of certain assets and stocks was "to obtain *formal appraisals* of all of the assets . . . at the time they were to be funded into the separate trusts."[8] He states that, to date, he "has not received any formal accounting and funding documents as he requested in the original petition and as required by the terms of the trust." Plaintiff notes courts have held that a beneficiary may request a full accounting, yet the trial court denied his request for an accounting.

In his opening brief's summary of argument, he does not expressly and specifically assert that he is entitled to an accounting or that the trial court erred in concluding that he was not. Instead, he only addresses the subject real property, and, as

---

[8] Plaintiff has offered no factual allegations or evidence addressed to any assets or stocks or any trust property other than the subject real property. Property in the form of assets or stocks other than the real property was not the subject of his petition. On appeal, he does not make specific arguments concerning any assets or stocks or any property other than the subject real property. Insofar as plaintiff's contention concerning the value of assets or stocks relates to the revaluing of the trust property, we concluded in part IV. of the Discussion, *ante*, that any revaluing was not warranted because the real property was allocated to the Survivor's Trust in 1994. Beyond our discussion of plaintiff's claimed entitlement to an accounting, we do not consider any claim as to any property other than the subject real property.

far as an accounting is concerned, only states that, even if defendant provided him with a full accounting, "this would not address the *main issue*," the subject real property.

In the conclusion of his opening brief, plaintiff requests that we "conclude in [our] de novo review that the Subject Property should have been retained in the Family Trust as required by the specific language of the original trust detailed in Schedule A of the Trust and that [defendant] should pay to the [plaintiff] one-half of the net proceeds he received from the sale of the family home after Betty passed and 10% interest from the date of sale." He does not mention an accounting.

The heading and subheading of the Discussion section of plaintiff's opening brief are, respectively, "Interpretation of Trust" and "The Trust Language Is Not Ambiguous." We have construed this liberally to address plaintiff's contention addressing the allocation and conveyance of the subject real property. Plaintiff does not include a separate heading in his brief asserting his entitlement to an accounting. (See generally California Rules of Court, rule 8.204(a)(1)(B) [each brief must state "each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority"].)

Nowhere in plaintiff's opening brief does he affirmatively request an accounting supported by meaningful argument and citation to relevant authority. "It is the responsibility of the appellant . . . to support claims of error with meaningful argument and citation to authority. [Citations.] When legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration. [Citations.] . . . We are not required to examine undeveloped claims or to supply arguments for the litigants." (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 (*Allen*); accord, *Save Agoura Cornell Knoll v. City of Agoura Hills* (2020) 46 Cal.App.5th 665, 704, fn. 14 ["On appeal, ' " 'the party asserting trial court error may not . . . rest on the bare assertion of error but must present argument and legal authority on each point raised. [Citation.]' [Citations.] When an appellant raises an issue 'but fails to

support it with reasoned argument and citations to authority, we treat the point as waived.' " ' "].)

Plaintiff affirmatively asserts his entitlement to an accounting for the first time in the conclusion of his reply brief. " ' "Obvious considerations of fairness in argument demand that the appellant present all of his [or her] points in the opening brief. To withhold a point until the closing brief would deprive the respondent of his [or her] opportunity to answer it or require the effort and delay of an additional brief by permission.[9] Hence the rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before." ' " (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764, quoting *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8; see also *Simpson v. The Kroger Corp.* (2013) 219 Cal.App.4th 1352, 1370 ["Raising a new theory in a reply brief is improper and unfair to defendants. We may decline to consider an argument raised for the first time in a reply brief if no good reason is demonstrated for the delay in raising the point"]; accord, *Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 630, fn. 9, quoting *Allen, supra*, 234 Cal.App.4th at p. 52 [" '[w]e do not consider points raised for the first time in the reply brief absent a showing of good cause for the failure to present them earlier' "].)

We conclude plaintiff has forfeited his contention that he is entitled to an accounting.[10]

---

[9] We acknowledge that defendant did, in fact, address the issue of an accounting in his brief. This does not change our analysis.

[10] Even if we were to interpret plaintiff's briefing broadly as properly raising the issue, we would conclude he is not entitled to an accounting. He makes no argument in this regard beyond those addressed to the subject real property and the valuation of other assets relative to the subject real property. We have concluded that the judgment correctly determined plaintiff had no right to the subject real property that was conveyed

## DISPOSITION

The judgment is affirmed.  Defendant shall recover his costs on appeal.  (Cal.
Rules of Court, rule 8.278(a)(1), (2).)


　　　　　　　　　　　　　　　　　　　　　　/s/　　　　　　　　　
　　　　　　　　　　　　　　　　　　　　　　MURRAY, J.


We concur:


　　　　/s/　　　　　　　
RAYE, P. J.


　　　　/s/　　　　　　　
KRAUSE, J.

---

to defendant free of trust in 2004.  This is fatal to any basis plaintiff asserts as entitling
him to an accounting, other than a speculative, conclusory, and unsupported claim that
assets and distribution may not have been properly valued.  Reversible error on this point
does not appear on the face of the record.  (*Nielsen*, *supra*, 178 Cal.App.4th at pp. 324-
325; *Bond*, *supra*, 50 Cal.App.4th at p. 924.)  Nothing in the record supports the premise
that plaintiff is entitled to an accounting.